IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| JULIA YOUNG, Individually and as Surviving Spouse and Next of Kin of CECIL YOUNG, DEBRA WILLIAMS, MICHAEL YOUNG, and CECIL YOUNG, JR., as Surviving Children of CECIL YOUNG, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 07-2547-STA |
| OLYMPUS AMERICA, INC., | ) ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S THIRD MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant Olympus America, Inc.'s Third Motion for Summary Judgment (D.E. # 94) filed on September 30, 2011. Plaintiffs have filed a response in opposition to the Motion, to which Defendant has filed a reply brief. For the reasons set forth below, Defendant's Motion is **GRANTED**.

**BACKGROUND**

As the Court has set out in its previous orders in this case, Plaintiffs have alleged a series of product liability claims against Defendant arising from the distribution of a medical device known as a bronchoscope. Plaintiffs allege that their father Cecil Young, deceased, contracted a bacterial infection in 2001 due to a defect in Defendant's bronchoscope. According to Plaintiffs, the defect in the bronchoscope allowed bacteria to collect on the instrument and prevented normal sterilization

1

procedures from eliminating the bacteria. Following the Court's Order Granting in Part, Denying in Part Defendant's Motion for Summary Judgment (D.E. # 55, May 6, 2010), only Plaintiffs' claim for breach of implied warranty remains. Pursuant to the same Order, the Court granted Plaintiffs an extension of time in which to obtain additional discovery for the purpose of responding to Defendant's Rule 56 motion. Defendant has now re-filed its Motion and seeks summary judgment on Plaintiff's remaining claim for breach of implied warranty.

Plaintiffs originally filed suit in the Circuit Court for Shelby County, Tennessee, against Defendant; Dr. Lisa Kennedy ("Dr. Kennedy"), the physician who performed the bronchoscopy on Cecil Young; and Methodist Hospital-North ("Methodist"), the hospital where the bronchoscopy was performed. After Defendant moved for summary judgment in the state court proceeding, Plaintiffs voluntarily dismissed Defendant from the case; however, their claims against Dr. Kennedy and the hospital remain pending in state court.

For purposes of summary judgment, the following facts are not in dispute unless otherwise noted. On March 27, 2001, Cecil Young was admitted to Methodist out of concern for a pulmonary infection. (Def.'s Statement of Fact ¶ 1.) On March 28, 2001, a sputum specimen was obtained from Cecil Young. A microbiological assay performed on the specimen revealed the presence of *Pseudomonas aeruginosa*. (*Id.* ¶ 2.)[1] On April 3, 2001, Dr. Kennedy performed a bronchoscopy on Cecil Young at Methodist. (*Id.* ¶ 3.) A bronchial washing specimen obtained during the April 3,

---

[1] Plaintiffs add that their expert Dr. Gary Salzman has opined that the sputum specimen was "collected in an unsterile fashion." (Pls.' Resp. to Def.'s Statement of Fact ¶ 2.) The Court notes that Dr. Salzman's report actually states that "the presence of pseudomonas aeruginosa from sputum (a non-sterile site) often represents colonization and not infection" and goes on to opine that "[t]he isolation of pseudomonas aeruginosa from non-sterile specimens should, therefore, be interpreted cautiously and often no treatment is needed." Salzman Report ¶ 10.

2

2001 bronchoscopy also demonstrated the presence of *Pseudomonas aeruginosa*, with an antibiogram consistent with it being the same organism found in the March 28, 2001 sputum specimen. (*Id.* ¶ 4.)[2]

Based originally on information it received about contamination at an unrelated hospital, OAI issued a recall of several models of bronchoscopes on December 3, 2001, several months after Mr. Young's procedure. (*Id.* ¶ 5.) OAI initiated the recall because some biopsy ports could become loose due to inconsistent application of adhesive. (*Id.* ¶ 6.) The recall covered certain models of bronchoscopes, including two models identified by Methodist North as being in use at the time of Mr. Young's bronchoscopy. (*Id.* ¶ 7.) While Defendant asserts that all customers were required to return bronchoscopes to OAI regardless of whether they actually manifested the condition (*Id.* ¶ 8.), the recall letter states that for instruments not manifesting the loose port, Defendant "would like you to return the bronchoscope at your convenience . . . ." (D.E. # 101-2.)

It is unknown which bronchoscope was used in the procedure on Mr. Young, because Methodist no longer has records of which model bronchoscopes were in use at the hospital at the time. (Def.'s Statement of Facts ¶ 9.) Plaintiff argues that there is record evidence that there were only two bronchoscopes in use at the Methodist campus were Cecil Young underwent the bronchoscopy. Both of these instruments were made by Olympus, both were subject to the recall, and both were returned and repaired shortly after the recall notice was issued. (Pls.' Resp. to Def.'s

---

[2] Plaintiffs object that Kelly Melton, the witness who gave testimony about the two specimens, stated that only DNA testing could confirm that the two were the same organism. (Pls.' Resp. to Def.'s Statement of Fact ¶ 4.) Additionally, Plaintiffs imply that Melton testified only as a lay witness and not as an expert. Because this statement of fact is not material to the Court's analysis for purposes of this Motion, the Court need not resolve the issue for purposes of summary judgment.

Statement of Fact ¶ 9.)

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving part "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[3] In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[4] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[5] It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[6] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[7] When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[8]

Summary judgment must be entered "against a party who fails to make a showing sufficient

---

[3] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[4] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[5] *Celotex*, 477 U.S. at 324.

[6] *Matsushita*, 475 U.S. at 586.

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[8] *Id.* at 251-52.

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[9] In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[10] Finally, the "judge may not make credibility determinations or weigh the evidence."[11] Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[12]

## ANALYSIS

Plaintiffs' only remaining claim against Defendant is their claim for breach of implied warranty as to the bronchoscope used during the bronchoscopy Cecil Young underwent on April 3, 2001. It is undisputed that Plaintiffs' claim for implied warranty is governed by the Tennessee Products Liability Act, Tenn. Code Ann. § 29-28-101 *et seq.*, ("the Act"), which defines a "product liability action" to include claims based on "breach of warranty, express or implied."[13] In order to establish their prima facie case for breach of implied warranty, Plaintiffs must show that (1) the product was defective and/or unreasonably dangerous; (2) the defect existed at the time the product left the manufacturer's control; and (3) the plaintiff's injury was proximately caused by the defective

---

[9] *Celotex*, 477 U.S. at 322.

[10] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[11] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[12] Fed. R. Civ. P. 56(a); *see also Celotex*, 477 U.S. at 322.

[13] Tenn. Code Ann. § 29-28-102(6); *Whitehead v. Toyota Motor Corp.*, 897 S.W.2d 684, 689 (Tenn. 1995).

product.[14] Under Tennessee law, an essential element of a product liability claim is that the product itself was in a defective condition or was unreasonably dangerous at the time it left the control of the manufacturer or seller.[15] For purposes of the Act, a "defective condition" is "a condition of a product that renders it unsafe for normal and anticipatable handling and consumption."[16] Furthermore, a product is "unreasonably dangerous" if that "product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it . . . or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller . . . ."[17] Under Tennessee law, Plaintiffs may prove a defect or dangerous condition in a product by means of direct evidence, circumstantial evidence, or a combination of both.[18]

The Court holds that Plaintiffs have failed to come forward with proof that the bronchoscope used in Mr. Young's procedure on April 3, 2001, was in a defective or unreasonably dangerous condition at the time it left Defendant's control. As an initial matter, the Court highlights its May 6, 2010 ruling in which Plaintiffs were granted additional time to obtain discovery about the bronchoscopes used at the Methodist North campus in 2001. At that time Plaintiffs had recently obtained evidence tending to show that Methodist had two bronchoscopes in use during 2001 and that one or both had the defective biopsy port at issue in this case. Then-counsel for Plaintiffs stated

---

[14] *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483–84 (6th Cir. 2008) (applying Tennessee law) (citation omitted).

[15] Tenn. Code Ann. § 29-28-105(a).

[16] § 29-28-102(2).

[17] § 29-28-102(8).

[18] *Browder v. Pettigrew,* 541 S.W.2d 402 (Tenn. 1976).

in his Rule 56(d) affidavit that Plaintiffs needed the following additional information in order to prepare their response to Defendant's earlier motion for summary judgment:

> other facts from Methodist related to problems with the bronchoscopes used at the Methodist Hospital-North campus in 2001 and 2002; the deposition of other witnesses concerning the bronchoscopes at issue; the final transcript of the March 25, 2010 deposition of Dr. Kennedy; and a supplemental affidavit incorporating this new information from Plaintiffs' expert Dr. Salzman.[19]

Plaintiffs' former counsel were granted leave to withdraw on January 12, 2011 (D.E. # 82). When the Court granted then-counsel for Plaintiffs' motion to withdraw from further representation, Plaintiffs were also granted an extension of time in which to conduct discovery. Following substitute counsel's entry of appearance, the Court subsequently gave Plaintiffs until August 31, 2011, in which to conduct further discovery (D.E. # 89), and that deadline was later extended to September 16, 2011 (D.E. # 93). Despite the enlargement of time to conduct discovery, it appears to the Court that the additional discovery to identify the relevant bronchoscope never materialized.

Fatal to Plaintiffs' implied warranty claim then is the inescapable conclusion that Plaintiffs have no evidence that the bronchoscope used on April 3, 2001 was defective or in an unreasonably dangerous condition at the time it left Defendant's control. Plaintiff's proffered expert on causation, Dr. Gary A. Salzman, concluded "within a reasonable degree of medical certainty that it is more likely than not the *pseudomonas aeruginosa* bacteria was introduced into Cecil Young's respiratory system during the April 3, 2001 bronchoscopy by the defective Olympus bronchoscope."[20] However, Dr. Salzman only assumed for purposes of his opinion that "the bronchoscope used in [Mr. Young's]

---

[19] Order Granting in Part, Denying in Part Def.'s Mot. Summ. J. 9, May 6, 2010 (D.E. # 55).

[20] Salzman Aff. ¶ 14.

procedure was subsequently recalled in order to replace a biopsy-port cap in the bronchoscope which may have been loose thereby allowing bacteria to enter the port where it could not be removed, even with the manufacturer's recommended disinfection and sterilization procedure."[21] The Court has previously ruled that evidence of the recall Defendant initiated in 2001 is not admissible to prove a defect in the bronchoscope.[22] Otherwise, there is simply no other proof in the record before the Court that the port "may have been loose" as Dr. Salzman assumed.

Viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs can only show that one of the two bronchoscopes in use at Methodist in 2001 had a loose biopsy port and even then only that the port was in this condition many months after April 2001. In the requests for admissions Plaintiffs obtained from Methodist, the hospital admitted that in April 2001, its GI Lab at the Methodist North campus utilized only two bronchoscopes. The hospital admitted that both instruments were Olympus models which were later subject to a recall for the loose port defect and that the hospital received a recall letter dated November 30, 2001. The hospital then admitted that when the hospital inspected the instruments some time after receiving the recall notice, "***one or both*** of the recalled Olympus bronchoscopes inspected had a loose biopsy sample port" (emphasis added).[23] Due to the disjunctive phrasing of Plaintiffs' request for admission, the hospital's

---

[21] Salzman Aff. ¶ 4. Defendant has filed a separate Motion in Limine to exclude Dr. Salzman's opinion testimony pursuant to Rule 702 of the Federal Rule of Evidence. Defendant's Motion in Limine is considered below.

[22] *See* Order Granting in Part Motion in Limine, Jan. 27, 2011 (D.E. # 84).

[23] Request for Admission 9, D.E. # 94-8. The hospital further admitted that "one of [sic] both of the recalled Olympus bronchoscopes were returned to Olympus for inspection and/or repair." Request for Admission 10, D.E. # 94-8. The Court finds that this admission only goes to show that both instruments from the Methodist North campus were returned for service, not that both had the defect, let alone that either had the defect in April 2001.

admission only establishes that one of the two bronchoscopes had a loose port when they were inspected some time after November 2001.[24] Even viewed in the light most favorable to Plaintiffs, this admission only proves that one of the instruments at the Methodist North campus had a loose biopsy port no later than November 2001. Plaintiffs have failed to adduce evidence from which a reasonable juror could find that the bronchoscope used in Cecil Young's procedure on April 3, 2001 was in a defective condition as Dr. Salzman assumed. On the contrary, this evidence without more would only invite a jury to speculate about whether the bronchoscope used in Mr. Young's case had the loose port. In short, Plaintiffs have failed to come forward with proof on this essential element of their implied warranty claim that the bronchoscope manifested the unreasonably dangerous condition alleged. For this reason Defendant is entitled to summary judgment.

In their response brief, Plaintiffs state without elaboration that "there is enough evidence for a reasonable juror to conclude Bronchoscope (sic) used on Mr. Young was defective." Plaintiffs do not specify what this evidence is or how it establishes that the bronchoscope used in Mr. Young's case was defective. Plaintiffs appear to rely largely on the fact that Mr. Young had a *Pseudomonas aeruginosa* infection as well as Dr. Salzman's report in which he merely assumed for purposes of his opinion that the bronchoscope had the loose-port defect. Of course, evidence of Mr. Young's infection alone does not prove that he was treated with a defective bronchoscope.[25] Furthermore,

---

[24] The Court would note that other courts have disapproved of requests for admission containing disjunctive statements. *See United States ex rel. Englund v. Los Angeles Cnty.*, 235 F.R.D. 675, 684 (E.D. Cal. 2006); *Herrera v. Scully*, 143 F.R.D. 545, 549 (S.D.N.Y. 1992). There is no evidence that Methodist Hospital, a non-party to this suit, ever objected to the form of Plaintiffs' requests for admissions.

[25] *King v. Danek Med., Inc.*, 37 S.W.3d 429, 435 (Tenn. Ct. App. 2000) ("In a product liability claim, the fact that a plaintiff is injured is not proof of a defect in the product.").

other than assuming the bronchoscope's defective condition, Dr. Salzman never affirmatively concluded that the bronchoscope used in Mr. Young's procedure had the loose-port defect. Indeed, Dr. Salzman did not even state whether he had examined the bronchoscopes or, for that matter, any other bronchoscope sold by Defendant. Dr. Salzman only stated that he referred to two articles published in the New England Journal of Medicine in which the authors had traced *Pseudomonas aeruginosa* infections to a loose-port defect in bronchoscopes sold by Defendant.[26] However, Dr. Salzman was not the author of the articles and did not interpret the findings or conclusions of the articles to connect the reports in any way to the bronchoscope at issue in this case. Taking this evidence in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have failed to show that the bronchoscope used in Mr. Young's case exhibited the alleged defect at the time of the procedure.

Even if Plaintiffs could prove that the bronchoscope used in Mr. Young's April 2001 bronchoscopy had a loose biopsy port at the time of the procedure, the Act requires proof of the product's unreasonably dangerous condition "at the time the product was placed on the market" and not "at the time of injury."[27] Here Plaintiffs have failed to offer competent proof to show that the

---

[26] *Pseudomonas aeruginosa and Serratia marcesens Contamination Associated with a Manufacturing Defect in Bronchoscopes*, N. ENGL. J. MED., Jan. 16, 2003 at 214-20; *An Outbreak of Pseudomonas aeruginosa Infections Associated with Flexible Bronchoscopes*, N. ENGL. J. MED., Jan 16., 2003, at 221-227. Plaintiffs have not attached these articles to their briefs on the Motion for Summary Judgment. They are, however, part of the record in this case. Fed. R. Civ. P. 56(c)(3) ("The court need only consider the cited materials, but it may consider other materials in the record.").

[27] § 29-28-105(b) ("In making this determination [about the product's dangerousness], the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.").

bronchoscope was in a defective or unreasonably dangerous condition at the time it left Defendant's control, an essential element of their claim. In this case Plaintiffs have specifically alleged that Defendant's bronchoscope was in an unreasonably dangerous condition at the time it left Defendant's control.[28] Tennessee law recognizes two tests for determining whether a product is unreasonably dangerous. The consumer expectation test "simply requires a showing that the product's performance was below reasonable minimum safety expectations of the ordinary consumer having ordinary, common knowledge as to its characteristics."[29] The prudent manufacturer test "requires proof about the reasonableness of the manufacturer or seller's decision to market a product assuming knowledge of its dangerous condition."[30] Although the Tennessee Supreme Court has held that the consumer expectation test can apply in all product liability cases,[31] a plaintiff must still "provide sufficient evidence to create a question of fact that the product was dangerous to an extent

---

[28] Compl. ¶ 26. The Sixth Circuit has called attention to the fact that the Tennessee courts have not clarified what difference, if any, there is between the legal tests for a "defective" product and an "unreasonably dangerous" product. *Privette v. CSX Transp., Inc.*, 79 F. App'x 879, 884 n.2 (6th Cir. 2003). This Court is not aware of any subsequent decisions from the Tennessee courts to address this issue. Nevertheless, the Court need not decide here whether the bronchoscope was "defective" as the Act defines the term. According to the Complaint, Plaintiffs' claim for products liability, including breach of implied warranty, is based on the unreasonably dangerous condition of the bronchoscope.

Plaintiffs' Complaint does allege in support of its strict liability claim that the bronchoscope was defective *and* unreasonably dangerous. Not only has the Court dismissed Plaintiffs' strict liability claim, proof of both defect and unreasonable dangerousness is required under Tennessee law in order to prevail on a strict liability theory. *See Olney v. Beaman Bottling Co.*, 418 S.W.2d 430, 462–63 (Tenn. 1967) (adopting Restatement (Second) of Torts § 402A).

[29] *Sigler*, 532 F.3d at 483–84 (quoting *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 806 (Tenn. 2001) (internal quotations omitted)).

[30] *Ray by Holman v. Bic Corp.*, 925 S.W.2d 527, 531 (Tenn. 1996).

[31] *Jackson*, 60 S.W.3d at 804.

beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."[32] The prudent manufacturer test, on the other hand, is more suitable for cases about products for which the ordinary consumer has no reasonable basis for expectations, namely in cases involving complex products.[33]

The Court holds that the prudent manufacturer test, and not the consumer expectation test, governs Plaintiffs' implied warranty claim. While it is true that the issue of whether a product is defective or unreasonably dangerous is generally a jury question,[34] Plaintiffs have adduced no evidence that an ordinary consumer would have an expectation about the performance of the bronchoscope at issue. Plaintiffs' Complaint includes the following description of the bronchoscope: "the bronchoscope is a flexible tube with a small light and camera which passes through the nose or mouth and is used to medically evaluate the airways and tissue of the lungs." (Compl. ¶ 13.) "It contains a valve-like component called a port." (*Id.*) "The port allows other medical devices, such as biopsy forceps, to be passed down an internal passage-way of the bronchoscope." (*Id.*) "During a typical use with a patient, the bronchoscope and its internal passages may become contaminated with blood, bodily fluids and tissue." (*Id.* ¶ 14.) "In between use on successive patients, proper practice dictates that the bronchoscopes be cleaned and flushed with a disinfectant to prevent the spread of infection." (*Id.* ¶ 15.) "During this process, disinfectant is circulated through the internal passages of the bronchoscope." (*Id.*)

---

[32] *Id.* at 805.

[33] *Bic Corp.*, 925 S.W.2d at 531; *Brown v. Raymond Corp.*, 432 F.3d 640, 644 (6th Cir. 2005).

[34] *Jackson*, 60 S.W.3d at 805.

The Complaint goes on to allege the unreasonably dangerous condition in Defendant's bronchoscope. "The need to permit disinfectant to thoroughly access all of the internal passages of the bronchoscope is central to the safe design criteria of the medical device." (*Id.* ¶ 16.) "On certain models of its bronchoscopes, Olympus negligently designed and manufactured a port valve which precluded the proper circulation of disinfectant, and caused a location for infectious media to colonize and to remain insulated from disinfection." (*Id.* ¶ 17.) "The design and manufacturing defect caused subsequent patients to have the infectious media introduced into their lungs, and to otherwise propagate infectious diseases from one patient to the next." (*Id.* ¶ 18.) Based on nothing more than the well-pleaded allegations of the Complaint, the Court holds that the device and its alleged defect are beyond the kiln of the ordinary consumer. Because an ordinary consumer would not have knowledge as to a bronchoscope's "safe design criteria," it follows that an ordinary consumer would not have minimum safety expectations about a bronchoscope. More specifically, there is no proof before the Court about an ordinary consumer's knowledge of the state of scientific and technological knowledge available to Defendant at the time the bronchoscope at issue was placed on the market or the customary designs, methods, standards and techniques of manufacturing, inspecting and testing medical devices such as bronchoscopes.[35] Therefore, the consumer expectation test is unavailable in this case, and Plaintiff must rely on the prudent manufacturer test to prove that the bronchoscope was in an unreasonably dangerous condition at the time it left Defendant's control.

In order to prove the unreasonably dangerous condition of a product under the prudent manufacturer test, a plaintiff must come forward with expert testimony "about the prudence of the

---

[35] *See* Tenn. Code Ann. § 29-28-105(b).

decision to market" the product in question.[36]  As a result, expert proof is essential in this case to show that the bronchoscope Defendant sold was in an unreasonably dangerous condition.  Based on the record before the Court, Plaintiff has not shown by expert proof that Defendant knew or should have known of the allegedly dangerous condition of its bronchoscope and yet decided to market the product anyway.  Plaintiff's only designated expert, Dr. Salzman, has not offered an opinion about the design or manufacture of the bronchoscope at issue.   As previously discussed, Dr. Salzman's opinion assumes the defective condition of the bronchoscope and is otherwise confined to the medical causation of Plaintiff's bacterial infection.  Dr. Salzman has not opined that the port cap on Defendant's bronchoscope became loose or otherwise failed as a result of any act or omission" of Defendant.[37]  Thus, Dr. Salman's report does not show that the bronchoscope was in an unreasonably dangerous condition at the time it left Defendant's control.  In the absence of some expert testimony about the design or manufacture of the bronchoscope to indicate its unreasonably dangerous condition, Plaintiff has failed to satisfy the elements of the prudent manufacturer test.  Without some proof from which a reasonable juror could find that the bronchoscope was in an unreasonably dangerous condition at the time it left Defendant's control, Plaintiffs' claim for implied warranty must be dismissed.  Therefore, Defendant's Motion is **GRANTED** as to this issue.

## II. Remaining Issues

Defendant has argued in the alternative that Plaintiff has failed to offer expert proof of causation, arguing that the undisputed evidence shows that the presence of *Pseudomonas aeruginosa*

---

[36] *Bic Corp.*, 925 S.W.2d at 531.

[37] *Carter v. Danek Med., Inc.*, No. 96-3243, 1999 WL 33537317, at *8 (W.D. Tenn. June 3, 1999).

in Mr. Young's system prior to undergoing the bronchoscopy. Defendant argues further that there is evidence that Defendant disclaimed any implied warranty as to the bronchoscope when it sold Methodist the bronchoscopes some time in the late 1990s. Defendant contends that under either of these additional theories it is entitled to summary judgment. Because the Court grants Defendant's Motion for Summary Judgment for the reasons previously discussed, it need not reach Defendant's alternative arguments.

### III. Defendant's Motion in Limine

Finally, Defendant has filed a separate Motion in Limine (D.E. # 95) to exclude the opinion testimony of Dr. Salzman. Because Defendant is entitled to summary judgment on other grounds, the Court need not consider the merits of the Motion in Limine, and the Motion is **DENIED** as moot.

### CONCLUSION

Defendant's Motion for Summary Judgment on Plaintiffs' remaining claim for breach of implied warranty is **GRANTED**. Plaintiffs have failed to present evidence that the bronchoscope used in Mr. Young's case manifested the alleged loose-port defect or that it was in an unreasonably dangerous condition when it left Defendant's control. Therefore, summary judgment is warranted.

**IT IS SO ORDERED.**

             **s/ S. Thomas Anderson**
             S. THOMAS ANDERSON
             UNITED STATES DISTRICT JUDGE

             Date: January 26, 2012.